**11-2610-cv**
**Newton v. City of New York**

1    UNITED STATES COURT OF APPEALS
2    FOR THE SECOND CIRCUIT
3
4
5    August Term, 2012
6
7    (Argued: October 3, 2012          Decided: February 26, 2015)
8
9    Docket No. 11-2610-cv
10
11   _____
12
13   ALAN NEWTON,
14
15   *Plaintiff-Appellant,*
16
17   v.
18
19   CITY OF NEW YORK,
20
21   *Defendant-Appellee.*[*]
22
23   _____
24
25   Before:
26
27   LYNCH, LOHIER, and DRONEY, *Circuit Judges.*
28

_____

[*]    The Clerk of Court is respectfully directed to amend the official caption to
conform with the above.

Appeal from a judgment of the United States District Court for the Southern District of New York granting the defendants' motion to set aside a jury verdict for plaintiff Alan Newton, who spent over twenty years in prison for rape, robbery, and assault before he was exonerated by DNA evidence.   The jury found that the City of New York had denied Newton his constitutional rights to due process and access to the courts when it failed to produce the rape kit that eventually exonerated him.   In granting the post-verdict motion, the District Court relied on our decision in *McKithen v. Brown*, 626 F.3d 143 (2d Cir. 2010). We conclude that (1) *McKithen* does not foreclose Newton's due process claim; (2) Section 440.10(1)(g) of the New York Criminal Procedure Law, which permits a court to vacate a conviction based on newly discovered evidence, gave Newton a liberty interest in demonstrating his innocence with new evidence; and (3) substantial evidence supported the jury's finding that the City acted with recklessness or deliberate indifference toward Newton's constitutional rights. **VACATED** and **REMANDED** with instructions to reinstate the jury verdict with respect to Newton's Fourteenth Amendment claim and to reconsider Newton's First Amendment claim in light of this opinion.

JOHN FRANCIS SCHUTTY, III, Law Office of John F. Schutty, P.C., New York, NY; David T. Goldberg, Donahue & Goldberg, LLP, New York, NY; Eric J. Hecker, Cuti Hecker Wang LLP, New York, NY, *for* Plaintiff-Appellant.

DRAKE A. COLLEY, Edward F.X. Hart, Arthur G. Larkin, *for* Michael A. Cardozo, Corporation Counsel for the City of New York, New York, NY, *for* Defendant-Appellee.

James W. Quinn, Karin S. Portlock, Devin M. Cain, Weil, Gotshal & Manges LLP, New York, NY; Keith A. Findley, Innocence Network, University of Wisconsin Law

1   School, Madison, WI, *for amicus curiae* The
2   Innocence Network.
3
4   Andrew H. Schapiro, Molly A. Karlin,
5   Quinn Emanuel Urquhart & Sullivan, LLP,
6   New York, NY, *for amici curiae*
7   Evidence-Management Professionals Bruce
8   Adams, Kolene Dean, Ron K. Peterson, John
9   San Agustin, John Vasquez.
10

LOHIER, <u>Circuit Judge</u>:

Nearly thirty years ago, Alan Newton was wrongly convicted of a crime he didn't commit.   He served over twenty years in prison.   Had he been given access to exonerating DNA evidence that the City of New York long misplaced and mishandled, Newton very likely would have been a free man years earlier. Newton and his attorneys procured his freedom, and a New York State court vacated his conviction, only after countless efforts to access that evidence finally came to fruition in 2006.   Once freed, Newton sued the City and various officials in the New York City Police Department ("NYPD"), claiming that the City's evidence management system was inadequate and had deprived him of his rights to due process and access to the courts in violation of the Fourteenth and First Amendments, respectively.   Newton prevailed in a federal jury trial in the United States District Court for the Southern District of New York on these constitutional claims against the City, but the District Court set aside the verdict based on our decision in <u>McKithen v. Brown</u>, 626 F.3d 143 (2d Cir. 2010).

1    We consider two primary issues on appeal.   First, does New York law

2    provide a convicted prisoner a liberty interest in demonstrating his innocence

3    with newly available DNA evidence?   Second, if so, does the Due Process Clause

4    of the Fourteenth Amendment entitle such a prisoner to reasonable procedures

5    that permit him to vindicate that liberty interest?   McKithen answers neither of

6    these questions; District Attorney's Office for the Third Judicial District v.

7    Osborne, 557 U.S. 52 (2009), requires that we answer both in the affirmative.   We

8    therefore vacate and remand with instructions to reinstate the jury verdict with

9    respect to Newton's Fourteenth Amendment claim and to reconsider Newton's

10   First Amendment claim in light of this opinion.

11                                    **BACKGROUND**

12        A.    Alan Newton's Conviction

13        On June 23, 1984, a woman, V.J., was assaulted, raped, and robbed after

14   leaving a convenience store in the Bronx.   V.J. lost her left eye and suffered four

15   broken ribs.   She described her attacker to a police detective as a black male who

16   identified himself as "Willie," approximately five feet, nine inches tall, from

17   twenty-five to twenty-seven years old, with a moustache and short, neat afro.

18   The NYPD collected a rape kit from V.J. that contained pubic and head hair, three

19   cotton swabs, and four microscope slides.   Based on photo arrays and later an

20   in-person line-up, V.J. identified Newton as her assailant.   A store clerk, too,

21   identified Newton from a photo array and a line-up.

                                        4

1    In May 1985 a Bronx County jury convicted Newton of rape, robbery, and

2  assault based on eyewitness testimony, including the store clerk's and V.J.'s

3  identification of Newton as her attacker.   Newton was sentenced to concurrent

4  prison terms of eight and one-third to twenty-five years for each of the rape and

5  robbery charges and a consecutive term of five to fifteen years for the assault.

6  The rape kit was not tested for DNA evidence prior to Newton's trial.[1]

7    B.    Attempts to Obtain DNA Testing and Exoneration

8    In 1988 Newton moved for an order authorizing an expert to inspect the

9  rape kit and conduct forensic tests to permit him to move to set aside his verdict

10  pursuant to New York Criminal Procedure Law Section 440.10.[2]

---

[1]  At the time, only limited serological testing was available.

[2]  At all relevant times, Section 440.10 provided as follows:

> At any time after the entry of a judgment, the court in which it was
> entered may, upon motion of the defendant, vacate such judgment
> upon the ground that . . . [n]ew evidence has been discovered since
> the entry of a judgment based upon a verdict of guilty after trial,
> which could not have been produced by the defendant at the trial
> even with due diligence on his part and which is of such character
> as to create a probability that had such evidence been received at
> the trial the verdict would have been more favorable to the
> defendant; provided that a motion based upon such ground must
> be made with due diligence after the discovery of such alleged
> new evidence . . . .

N.Y. Crim. Proc. Law § 440.10(1)(g) (McKinney 2012); N.Y. Crim. Proc. Law
§ 440.10(1)(g) (McKinney 1970).

1    The New York State Supreme Court granted Newton's motion and ordered the

2    Bronx County District Attorney to arrange to deliver the DNA sample to the

3    City's Office of the Chief Medical Examiner, where Newton's expert could

4    supervise testing.    The District Attorney's Office retrieved the rape kit from the

5    NYPD's Property Clerk Division ("PCD") and delivered it to the Office of the

6    Chief Medical Examiner, which reported that the sample contained no testable

7    spermatozoa.

8        Six years later, in 1994, the New York State legislature enacted New York

9    Criminal Procedure Law Section 440.30(1-a), which permits a defendant to seek

10   testing of DNA evidence in order to vacate his conviction as follows:

11            [W]here the defendant's motion requests the performance of a
12            forensic DNA test on specified evidence, and upon the court's
13            determination that any evidence containing deoxyribonucleic
14            acid ("DNA") was secured in connection with the trial resulting
15            in the judgment, the court shall grant the application for forensic
16            DNA testing of such evidence upon its determination that if a
17            DNA test had been conducted on such evidence, and if the results
18            had been admitted in the trial resulting in the judgment, there
19            exists a reasonable probability that the verdict would have been
20            more favorable to the defendant.

21   N.Y. Crim. Proc. Law § 440.30(1-a) (McKinney 1994).    Shortly after Section

22   440.30(1-a) was enacted, Newton filed a pro se motion in State court seeking DNA

23   testing of the rape kit on the ground that technological advances since 1988 had

24   enabled scientists to test samples they had previously deemed untestable.    In

25   opposing the motion, the District Attorney's Office responded that its extensive

6

1    investigation had revealed that the physical evidence was never returned after the

2    1988 analysis and that the rape kit could not be found at the District Attorney's

3    Office, the PCD, or the Office of the Chief Medical Examiner.    The State court

4    denied Newton's motion.

5         In 1995 Newton filed a habeas corpus petition under 28 U.S.C. § 2254 in the

6    Southern District of New York.    In the course of the habeas proceeding, and in

7    response to Newton's request in that proceeding that the City produce the rape

8    kit for testing, the City informed Newton and the court that the kit "could not . . .

9    be located."    Joint App'x 3316.    Other than V.J.'s clothes, which the City was

10   able to find as part of its response to Newton's petition, little else appears to have

11   come of Newton's habeas proceeding.    And so, in 1998, Newton again sought

12   DNA testing of the rape kit and other physical evidence from State court.    Citing

13   conversations with the PCD, the District Attorney's Office reaffirmed that the

14   rape kit could not be located and opposed the motion.    As part of the

15   government's opposition, an NYPD Sergeant explained that the voucher

16   describing the location of the rape kit was not in its last listed location and that the

17   kit "must have been destroyed."    Joint App'x 2779.    The Sergeant elaborated

18   that the voucher was probably destroyed, either because a 1995 fire at the

19   Property Clerk's Office had destroyed several files or because the Property

20   Clerk's Office had a practice of destroying inactive records after six years.

21   Although the State court granted Newton's motion insofar as he sought DNA

7

1   testing of V.J.'s clothes, which the police had found, it denied his motion as to the

2   rape kit.

3          In 2005 Newton, through counsel, asked an Assistant District Attorney

4   ("ADA") who was then Chief of the Sex Crimes Bureau of the Bronx County

5   District Attorney's Office and who had previously not been directly responsible

6   for handling Newton's case whether the PCD would search once more for the

7   rape kit.   Attaching a copy of the voucher that had previously been reported lost,

8   the ADA asked Inspector Jack Trabitz at the PCD to retrieve the rape kit.[3]   Based

9   on the barrel number for the rape kit that appeared on the voucher, the PCD was

10  able to find the rape kit in a barrel located in the PCD's Pearson Place Warehouse

11  in Queens.

12         In June 2006 the Office of the Chief Medical Examiner concluded that the

13  DNA profile derived from the rape kit did not match Newton's DNA profile.

14  Within a month, Newton and the District Attorney's Office jointly moved to

15  vacate his conviction.   The next day, the New York State Supreme Court vacated

16  Newton's conviction pursuant to New York Criminal Procedure Law Section

17  440.10(1)(g).   By this time, Newton had been incarcerated for more than twenty

18  years.   He had been seeking the evidence for the renewed testing that exonerated

19  him – and had been repeatedly told that it no longer existed and could not be

20  found – for over a decade.

---

[3] It is unclear how the ADA obtained this copy of the voucher.

1     C.     Newton's Lawsuit

2          Newton was immediately released from prison and filed his lawsuit a year

3     later.   His complaint asserted twenty-one causes of action against the City and

4     individual defendants.   As relevant to this appeal, Newton alleged that the City's

5     evidence management system "deprive[d] [him] of important and well

6     established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth

7     Amendments to the United States Constitution," as well as his right to access to

8     the courts under the First Amendment.   In October 2009 the District Court

9     dismissed his constitutional claims against the individual defendants so that only

10    common law claims remained against some of them.

11          Relying on Osborne, however, the District Court allowed Newton to

12    continue his claim against the City for violating his due process rights.[4]   In

13    Osborne, the Supreme Court ruled that an Alaska statute that permitted a

14    prisoner to challenge his conviction when newly discovered evidence requires

15    vacatur of the conviction gave the plaintiff "a liberty interest in demonstrating his

16    innocence with new evidence."   557 U.S. at 68.   The District Court concluded

17    that Section 440.30(1-a)(a) of New York's Criminal Procedure Law[5]  conferred on

---

[4] The District Court also separately refused to dismiss Newton's First
Amendment claim.

[5] Section 440.30(1-a)(a) was not enacted until 2004.   The District Court's mistaken
reference to subsection (1-a)(a) – rather than to subsection (1-a), which was in
effect at the time that Newton filed his pro se motion in State court seeking DNA
testing of the rape kit – is understandable and of no moment because the relevant
language in both versions of the statute is the same.   Compare N.Y. Crim. Proc.

9

1   Newton a similar "liberty interest in vacating his conviction by accessing

2   evidence in the state's possession for the purpose of DNA testing."   Newton v.

3   City of New York, 681 F. Supp. 2d 473, 489 (S.D.N.Y. 2010).   The court also

4   determined that Newton had raised a triable question as to whether New York's

5   procedures were inadequate to vindicate his rights: "Newton has tested New

6   York's procedures and has shown them to fail."[6]   Id. at 490.

7          Before trial, discovery in the case uncovered the original voucher for the

8   rape kit, which in turn revealed that the PCD had received a photocopy of an

9   "out-to-court" log from the City's Corporation Counsel in 2009 indicating that the

10  rape kit had last been removed in 1988.   The photocopy had prompted the PCD

11  to review the file of out-to-court vouchers for 1988 and led to the discovery of the

12  original voucher in that file.

---

Law § 440.30(1-a)(a) (McKinney 2004), with N.Y. Crim. Proc. Law § 440.30(1-a) (McKinney 1994).

[6] The District Court initially determined that Newton stated a claim against the City for failure to train or supervise.   The defendants then moved for reconsideration in light of Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998), which held that a plaintiff could not sustain a municipal liability claim under a failure to train theory when the city's employees had violated a right that was not clearly established at the time.   In a January 2010 order, the District Court acknowledged that it was bound by our decision in Young and instead relied on Tenenbaum v. Williams, 193 F.3d 581, 595-97 (2d Cir. 1999), in which we allowed a plaintiff to pursue a claim against a municipality for an unlawful city policy when the rights at issue were not clearly established at the time of the violation.   Newton was then permitted to proceed on the theory that the City maintained an unlawful policy, custom, or practice.

1   After a three-week trial, a jury found that the City had denied Newton his

2   First Amendment right of access to the courts and his Fourteenth Amendment

3   right to due process of law, had "engaged in a pattern, custom or practice of

4   mishandling evidence" and "acted with an intent to deprive . . . Newton of his

5   constitutional rights or with a reckless disregard of those rights," and had

6   proximately caused Newton's protracted incarceration.[7]   The jury awarded

7   Newton $18 million in compensatory damages against the City.

8       The defendants moved to set aside the verdict pursuant to Rule 50 of the

9   Federal Rules of Civil Procedure, arguing that our decision in McKithen v. Brown,

10  issued after the verdict, foreclosed relief.   In granting that motion, the District

11  Court relied on McKithen, Osborne, and New York Criminal Procedure Law

12  Section 440.30(1-a)(b).   Based on McKithen and Osborne, it determined that

13  Newton did not have "a right to receive the DNA evidence," but merely "a right

14  to the process under the New York statute."   Newton v. City of New York, 784 F.

15  Supp. 2d 470, 479 (S.D.N.Y. 2011) (emphases omitted).   It also interpreted Section

16  440.30(1-a)(b) as (1) authorizing a State court, faced with a motion to vacate, to

17  order the police to disclose the last known physical location of evidence, but (2)

---

[7] The jury also found Inspector Jack Trabitz, the then-head of the PCD, and Sergeant Patrick McGuire, a PCD intake supervisor, liable for intentional infliction of emotional distress ("IIED").   The District Court later overturned the entirety of the jury's verdict, including its IIED finding.   Newton v. City of New York, 784 F. Supp. 2d 470, 483-85 (S.D.N.Y. 2011).   Newton does not appeal the District Court's decision on his IIED claims.   Therefore, we consider only Newton's First Amendment access-to-courts and Fourteenth Amendment due process claims against the City.

11

1    preventing the same court from drawing an unfavorable inference from the fact

2    that the evidence has been lost. <u>Id.</u> at 478. The District Court observed that

3    prior to the enactment of Section 440.30(1-a)(b) in 2004 the City was not obligated

4    to disclose the location of evidence and that, in any event, Section 440.30(1-a)(b)

5    contemplated the possibility of lost evidence. <u>Id.</u> at 479-80. For these reasons,

6    the District Court held that Newton was entitled to no more than the last known

7    location of the evidence.

8        The District Court also held that Newton's constitutional due process claim

9    failed because there was not enough evidence that City officials had acted with a

10    culpable state of mind. <u>Id.</u> at 480-81. It concluded that although Newton had

11    demonstrated that the City's evidence management system was deficient, he had

12    failed to prove that a specific person had acted with anything more than

13    negligence. In addition, relying on the failure of his underlying Fourteenth

14    Amendment claim, the District Court granted the City's motion to set aside the

15    verdict as to Newton's First Amendment claim.

16        Newton appealed.

17                        **DISCUSSION**

18    "We review <u>de novo</u> a district court's decision to grant a Rule 50 motion for

19    judgment as a matter of law, applying the same standard as the district court."

20    <u>Cash v. Cnty. of Erie</u>, 654 F.3d 324, 332-33 (2d Cir. 2011) (citations omitted). A

21    court may grant a Rule 50 motion only if "a party has been fully heard on an issue

22    during a jury trial and the court finds that a reasonable jury would not have a

1   legally sufficient evidentiary basis to find for the party on that issue."   Fed. R.

2   Civ. P. 50(a)(1).   Although a party making a Rule 50 motion always faces a heavy

3   burden, "[t]hat burden is particularly heavy where, as here, the jury has

4   deliberated in the case and actually returned its verdict in favor of the

5   non-movant."   Cash, 654 F.3d at 333 (quotation marks omitted).

6       A.   Fourteenth Amendment Due Process Claim

7       We review Newton's Fourteenth Amendment Due Process claim

8   "according to the familiar two-part test for analyzing alleged deprivations of

9   procedural due process rights: (1) whether [Newton] has a cognizable liberty or

10  property interest under state or federal law . . .; and (2) if so, whether [Newton]

11  was afforded the process he was due under the Constitution."   McKithen, 626

12  F.3d at 151.

13          1.   Newton's Liberty Interest

14      To determine whether New York law conferred on Newton a liberty

15  interest in demonstrating his innocence with newly discovered evidence, we start

16  with Osborne.

17      William Osborne was convicted by an Alaska jury of kidnapping, assault,

18  and sexual assault and sentenced to twenty-six years in prison.   557 U.S. at 58.

19  In a federal post-conviction proceeding, Osborne sued State officials under 42

20  U.S.C. § 1983, claiming the Due Process Clause gave him a constitutional right to

21  access DNA evidence in the case for testing by an advanced method not available

22  at the time of his trial.   Id. at 60.   The Ninth Circuit held that Alaska was

1   required to disclose the DNA evidence to Osborne as part of its Brady obligations,

2   which extended to certain potentially viable post-conviction claims of actual

3   innocence.   Osborne v. Dist. Att'y's Office for the Third Judicial Dist., 521 F.3d

4   1118, 1128-32 (9th Cir. 2008), rev'd, 557 U.S. 52 (2009).   Without identifying the

5   precise standard Osborne needed to satisfy in order to prevail on his

6   access-to-evidence claim, the Ninth Circuit determined that Osborne had

7   demonstrated more than a reasonable probability that he would not have been

8   convicted had the DNA evidence been disclosed to the defense at trial.   Id. at

9   1133-34.

10        The Supreme Court reversed on the ground that there was no freestanding

11  substantive due process right to DNA evidence.   557 U.S. at 72.   Citing the

12  progress of individual States in passing DNA-testing statutes, the Court

13  expressed its reluctance to expand the scope of substantive due process or to

14  embroil federal courts in questions of State-based policy – for example, questions

15  such as "how long" a State must "preserve forensic evidence that might later be

16  tested," or whether a State would be obligated to collect evidence before trial.   Id.

17  at 73-74.

18        Despite its reservations about expanding the scope of the substantive due

19  process right, the Court located a liberty interest grounded in a general

20  post-conviction relief statute enacted by the Alaska legislature that made

14

evidence from DNA testing available to defendants.   Id. at 68.   That statute

provided:

> A person who has been convicted of, or sentenced for, a crime may
> institute a proceeding for post-conviction relief if the person
> claims . . . (4) that there exists evidence of material facts, not
> previously presented and heard by the court, that requires
> vacation of the conviction or sentence in the interest of justice . . . .

Alaska Stat. § 12.72.010 (2008).   A related provision stated, in relevant part:

> (b) . . . a court may hear a claim [brought under Alaska Stat.
> § 12.72.010] . . . (2) based on newly discovered evidence if the
> applicant establishes due diligence in presenting the claim and
> sets out facts supported by evidence that is admissible and . . . (D)
> [that] establishes by clear and convincing evidence that the
> applicant is innocent.

Alaska Stat. § 12.72.020 (2008).   Based on these Alaska statutory provisions, the

Court concluded that "Osborne does . . . have a liberty interest in demonstrating

his innocence with new evidence under state law," 557 U.S. at 68, and that

"Alaska provides a substantive right to be released on a sufficiently compelling

showing of new evidence that establishes innocence," id. at 70.

The City does not genuinely dispute that New York law conferred on

Newton "a liberty interest in demonstrating his innocence with new evidence."

McKithen, 626 F.3d at 152.   Newton retains such an interest even without the

City's concession.   For the purpose of determining whether a liberty interest

exists in this case, we think the New York statute that Newton invokes is

materially indistinguishable from the Alaska statute upon which Osborne relied.

15

1    Specifically, at the time Newton filed suit, Section 440.10(1)(g)[8] of the New York

2    Criminal Procedure Law provided that a court "may, upon motion of the

3    defendant, vacate" a conviction on the ground that "[n]ew evidence has been

4    discovered" that would probably have led to an outcome at trial more favorable

5    to the defendant.[9] N.Y. Crim. Proc. Law § 440.10(g) (McKinney 1970).

6    Moreover, the State's explicit statement on the importance of DNA testing –

7    reflected in its enactment of Section 440.30(1-a) in 1994 – only strengthens the case

8    for State recognition of a liberty interest.

9                    2.    <u>What Process Was Due</u>

10   We turn next to determine what process was due to vindicate Newton's

11   State-created liberty interest in demonstrating his innocence with new evidence,

12   mindful of <u>Osborne</u>'s related pronouncement that "[t]his 'state-created right can,

---

[8] Section 440.10(1)(g-1) now permits a judge to vacate a sentence in light of "[f]orensic DNA testing of evidence." This section, which gives a movant a more specific liberty interest in proving his innocence with DNA testing, was not enacted until 2012, long after Newton's conviction was vacated. <u>See</u> 2012 N.Y. Sess. Laws 294 (McKinney). Newton therefore cannot rely on the current version of the statute. Under <u>Osborne</u>, however, the broader language of subsection (1)(g) covers newly available DNA evidence and gives Newton a liberty interest.

[9] Although the language of the Alaska statute in <u>Osborne</u> provides only that a court may "<u>hear a claim</u>" brought under Section 12.72.010, Alaska Stat. § 12.72.020(b) (2008) (emphasis added), and Section 12.72.010 provides only that the defendant may "<u>institute a proceeding</u> for post-conviction relief," <u>id.</u> § 12.72.010 (emphasis added), the Supreme Court read this State law to confer a liberty interest in <u>demonstrating one's innocence</u> with new evidence. <u>Osborne</u>, 557 U.S. at 68.

1    in some circumstances, beget yet other rights to procedures essential to the

2    realization of the parent right.'"    557 U.S. at 68 (quoting Conn. Bd. of Pardons v.

3    Dumschat, 452 U.S. 458, 463 (1981)).

4            As the Supreme Court explained, "[a] criminal defendant proved guilty

5    after a fair trial does not have the same liberty interests as a free man."    Id.    In

6    identifying any "other" procedural rights that may exist in this case, therefore, we

7    start with the principle that a defendant who has been convicted after a fair trial

8    "has only a limited interest in postconviction relief" and that the State may

9    flexibly fashion and limit procedures to offer such relief.    Id. at 69.    We have

10   explained that "the . . . deferential standard of Medina v. California, 505 U.S. 437

11   (1992), governs the process due a prisoner seeking evidence for the purpose of

12   obtaining post-conviction relief."    McKithen, 626 F.3d at 152.    In keeping with

13   that standard, "which the Medina Court described as applying to 'state

14   procedural rules which . . . are part of the criminal process,'" we evaluate New

15   York's procedures for fundamental adequacy.    Id. at 152-53 (quoting Medina,

16   505 U.S. at 443).    Fundamental adequacy does not mean that State procedures

17   must be flawless or that every prisoner may access the DNA evidence collected in

18   his case.    Nor does it mean that DNA evidence must be stored indefinitely.    It

19   means only that when State law confers a liberty interest in proving a prisoner's

20   innocence with DNA evidence, there must be an adequate system in place for

21   accessing that evidence that does not "offend[] some principle of justice so rooted

22   in the traditions and conscience of our people as to be ranked as fundamental," or

17

1   "transgress[] any recognized principle of fundamental fairness in operation.'"

2   Medina, 505 U.S. at 445, 448 (quotation marks omitted).

3       Before turning to New York law (both in McKithen and in this case), we

4   consider how these principles applied to the Alaska statute in Osborne.   The

5   procedures Alaska implemented to vindicate a defendant's right to

6   post-conviction relief could not plausibly be described as inadequate under the

7   Medina standard: with caveats not relevant here, Alaska law provided for

8   discovery of newly available DNA evidence in post-conviction proceedings, 557

9   U.S. at 69-70, and the Alaska courts reinforced the statutory protection with a

10  prophylactic measure that permitted defendants to access DNA evidence if they

11  could demonstrate that (1) the conviction rested primarily on eyewitness

12  identification evidence, (2) there was a demonstrable doubt concerning the

13  identification of the defendant, and (3) scientific testing was likely to resolve the

14  doubt, id. at 65 (citing Osborne v. State, 110 P.3d 986, 995 (Alaska Ct. App. 2005)).

15  Moreover, in concluding that the Alaska State "procedures [we]re adequate on

16  their face," the Supreme Court emphasized that "without trying them, Osborne

17  [could] hardly complain that they do not work in practice," id. at 71, and that

18  Osborne's decision to file a § 1983 action instead of "avail[ing] himself of all

19  possible avenues for relief in [Alaska] state court" had impaired his due process

20  claim, id. at 88 (Stevens, J., dissenting) (summarizing majority opinion).

21  Accordingly, the Court concluded that Osborne had received the process he was

1    due and had no free-standing federal constitutional right to the DNA evidence he

2    sought.

3         Although, as we have pointed out, the New York statute at issue in this

4    case, Section 440.30(1-a), is in several respects quite similar to the Alaska statute in

5    Osborne, what differences exist between the two statutes inure to Newton's

6    benefit.   For example, Alaska's statute requires that the new evidence prove

7    actual innocence by clear and convincing evidence, while New York's Section

8    440.30(1-a) demands less of New York defendants, who must show only that the

9    evidence creates a probability of a more favorable outcome.   Considering the

10   similarities and differences between the two statutes, we conclude that the liberty

11   interest created by New York law is no narrower than that created by Alaska law;

12   procedures for vindicating this interest therefore should also be evaluated under

13   the standard described in Osborne.

14        In asking us in effect to condone its evidence management procedures in

15   this case, the City invokes our decision in McKithen, on which the District Court

16   also relied to dismiss Newton's Fourteenth Amendment claim.   McKithen had

17   been convicted by a Queens jury of a number of serious crimes.   He moved

18   pursuant to Section 440.30(1-a)(a) for DNA testing of evidence recovered at the

19   crime scene.   The State court denied his motion on the ground that "there was no

20   reasonable probability that McKithen would have received a more favorable

21   verdict had the forensic testing been performed and the results been admitted at

22   trial."   626 F.3d at 146.   McKithen then sued the Queens District Attorney in

19

federal court, claiming that the denial of access to evidence for post-conviction

DNA testing on its face violated his right to due process under the Fourteenth

Amendment.   Rejecting McKithen's facial due process challenge, we held that

New York State's procedure for post-conviction relief under Section 440.30(1-a)(a)

is facially adequate, see id. at 152, and that federal courts "are to defer to the

judgment of state legislatures concerning the process due prisoners seeking

evidence for their state court post-conviction actions," id. at 153.   Our decision in

McKithen thus represented a straightforward application of Osborne to New

York State law, as both Osborne and McKithen addressed direct facial challenges

by plaintiffs relating to the effectiveness of State (in contrast to municipal)

post-conviction relief procedures.   See Osborne, 557 U.S. at 71.

        McKithen resolved an issue different from the one that this appeal compels

us to consider.   Unlike McKithen, Newton readily concedes that the State's

statutory procedures are adequate.   Instead, he contends that the City, not the

State, provided him with fundamentally inadequate process by undermining the

State's procedures by its recklessly chaotic evidence management system.

Having demonstrated that (in contrast to Osborne and McKithen) he diligently

and repeatedly tried the State's procedures for obtaining the necessary DNA

evidence, Newton claims that the NYPD's evidence management system was so

inadequate as to nullify those procedures.   This appeal and Newton's arguments

thus present an issue that we have yet to address relating to the interaction

between State law and local government in the context of post-conviction relief.

20

1    We are unaware of precedent that prevents Newton from challenging a municipal

2    custom or practice that, he contends, undermines otherwise adequate State

3    procedures.    McKithen certainly does not do so, and so the District Court erred

4    insofar as it held that McKithen squarely foreclosed Newton's claims.    Moreover,

5    by pointing out Osborne's failure to avail himself of Alaska's procedures,

6    Osborne appears to have contemplated precisely such as-applied challenges by

7    plaintiffs who attempt unsuccessfully to invoke State post-conviction relief

8    procedures.    See 557 U.S. at 71.

9        The procedures created by Section 440.30(1-a) require the State, upon a

10   defendant's motion, to "show what evidence exists and whether the evidence is

11   available for testing."    People v. Pitts, 4 N.Y.3d 303, 311 (2005).[10]    In essence,

12   Section 440.30(1-a) creates an "essential" corollary procedural right to a faithful

13   accounting of evidence.    See Osborne, 557 U.S. at 68.    In New York, local

14   government appears to play an integral role in this process, see N.Y.C. Admin.

---

[10]  Pitts was decided in 2005 after the New York State Legislature amended
Section 440.30(1-a) through the addition of subsection (b), which permitted a
court to "direct the people to provide the defendant with information in the
possession of the people concerning the current physical location of the specified
evidence and if the specified evidence no longer exists or the physical location of
the specified evidence is unknown, a representation to that effect and information
and documentary evidence in the possession of the people concerning the last
known physical location of such specified evidence."    N.Y. Crim. Proc. Law
§ 440.30(1-a)(b); see 2004 N.Y. Sess. Laws 2794 (McKinney).    However, the New
York Court of Appeals concluded that the statute as originally enacted did not
"place on defendants the burden to establish the location and status of the
evidence they seek to be tested."    Pitts, 4 N.Y.3d at 311.

1   Code § 14-140(a)(1)-(2) (instructing the property clerk of the PCD to "take charge

2   of all property" seized by police and requiring that "[a]ll such property . . . be

3   described and registered by the property clerk in a record kept for that purpose"),

4   and a failure of local government in carrying out its role can nullify the adequacy

5   of State procedures and expose the municipality to constitutional liability.

6        This is hardly a new concept.   In other contexts we have permitted

7   plaintiffs to pursue claims against municipalities for deprivations of State-created

8   interests.   See, e.g., Kapps v. Wing, 404 F.3d 105, 112, 118-26 (2d Cir. 2005) (City

9   administration of State Home Energy Assistance Program was constitutionally

10  inadequate to vindicate plaintiffs' property interest in program benefits); Winston

11  v. City of New York, 759 F.2d 242, 247-49 (2d Cir. 1985) (provision of City

12  Administrative Code violated teachers' due process rights by depriving them of a

13  property interest in their contractual right to a pension, derived from the State

14  Constitution); see also Goldberg v. Kelly, 397 U.S. 254, 260-66 (1970) (City

15  procedures inadequate to vindicate rights created by State and federal programs).

16  If procedures followed by a municipality rather than a State prove to be

17  constitutionally inadequate, even in the context of facially adequate State

18  procedures, then a defendant may sue the municipality for violating his due

19  process rights on the ground that the municipality's implementation of State

20  procedures is inadequate.

21        Even in the realm of municipal (rather than State) inadequacy, however, we

22  must take care to avoid "suddenly constitutionaliz[ing]" the area of DNA testing

1   and thereby "plac[ing] the matter outside the arena of public debate and

2   legislative action."   Osborne, 557 U.S. at 73 (quoting Washington v. Glucksberg,

3   521 U.S. 702, 720 (1997)).   At least three factors help us avoid that pitfall here.

4        First, reinstating the § 1983 verdict against the City will not impair the

5   validity of, or expand the rights provided by, Section 440.30(1-a)(a).   As noted,

6   this case presents a challenge to the City's execution of State law, not to the law

7   itself.   See McKithen, 626 F.3d at 153 ("[T]he Osborne Court was clear that the

8   lower federal courts are to defer to the judgment of state legislatures concerning

9   the process due prisoners seeking evidence for their state court post-conviction

10  actions." (emphasis added)); see also id. at 154 ("Barring proof of fundamental

11  inadequacy, Osborne obligates us to defer to the New York [State] legislature's

12  judgment . . . .").   We defer to States in this area because "it is normally within

13  the power of the State to regulate procedures under which its laws are carried

14  out," Patterson v. New York, 432 U.S. 197, 201 (1977) (quotation marks omitted),

15  and States have "considerable expertise in matters of criminal procedure and the

16  criminal process . . . grounded in centuries of common law tradition," Medina,

17  505 U.S. at 445-46.

18       Second, when, as here, a municipality promulgates policies or practices that

19  affect the criminal procedure laws of the State, those policies or practices may fail

20  to reflect the considered judgment of the State legislature.   A local pattern,

21  custom, or practice may frustrate or even obstruct otherwise adequate State law

22  procedures.   In those instances, it seems to us, neither Osborne nor Medina

23

1    mandates the same level of deference to local government as they do to State

2    legislative action.

3         Third, the procedural right at issue here is quite narrow: Newton was not

4    entitled to the preservation of evidence under State law, but only to a faithful

5    accounting of the evidence in the City's possession.   We do not decide what

6    specific City procedure is necessary to manage and track evidence.   We simply

7    reinstate a jury verdict that found that the then-existing system was inadequate

8    and that the City, through its agents, servants, or employees, intentionally or

9    recklessly administered an evidence management system that was

10   constitutionally inadequate and that prevented Newton from vindicating his

11   liberty interest in violation of his Fourteenth Amendment right to due process.

12        The addition in 2004 of New York Criminal Procedure Law Section

13   440.30(1-a)(b) does not alter our analysis.   That section provides that in

14   conjunction with a motion to vacate under Section 440.30:

15         [T]he court may direct the people to provide the defendant with
16         information in the possession of the people concerning the current
17         physical location of the specified evidence and if the specified
18         evidence no longer exists or the physical location of the specified
19         evidence is unknown, a representation to that effect and
20         information and documentary evidence in the possession of the
21         people concerning the last known physical location of such
22         specified evidence.   If there is a finding by the court that the
23         specified evidence no longer exists or the physical location of such
24         specified evidence is unknown, such information in and of itself
25         shall not be a factor from which any inference unfavorable to the

1    people may be drawn by the court in deciding a motion under this
2    section.

3    N.Y. Crim. Proc. Law § 440.30(1-a)(b).   By envisioning that evidence might be

4    lost or destroyed, the provision reinforces the limited nature of a convicted

5    defendant's liberty interest in proving his innocence through DNA evidence.

6    But it does so without eliminating the requirement that fundamentally adequate

7    procedures be in place to allow the defendant to vindicate that interest.   Again, a

8    fundamentally adequate system for permitting defendants to access evidence

9    does not mean one in which evidence is never lost or destroyed.   Any police

10   department will occasionally lose evidence, including useful evidence; absent

11   more, that lapse will not violate a defendant's due process rights.   See Arizona v.

12   Youngblood, 488 U.S. 51, 58 (1988).   Rather, Section 440.30(1-a)(b) is consistent

13   with requiring the NYPD's evidence management system to provide an adequate

14   means to determine if evidence is available for testing and, if so, where the

15   evidence is located.   In addition, Section 440.30(1-a)(b)'s proscription that no

16   "inference unfavorable to the people may be drawn" from the fact that evidence is

17   missing or destroyed applies exclusively to motions to vacate.   The legislature's

18   reasonable determination that a convicted defendant should not be released

1  because the police have lost relevant evidence does not prevent an exonerated

2  person from having a civil remedy under § 1983 against a municipality for an

3  inadequate evidence management system.

4         3.      Whether the Evidence Was Sufficient for a Reasonable Jury to
5                 Find that the City Denied Newton the Process He Was Due

6         To impose liability on a municipality under § 1983, a plaintiff must

7  "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."   Bd.

8  of Cnty. Comm'rs of Bryan Cnty. Okla. v. Brown, 520 U.S. 397, 403 (1997) (citing

9  Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 694 (1978)).   The

10  City acknowledges that the District Court correctly instructed the jury that in

11  order to find the City liable it was required to find that the "municipality itself

12  directly cause[d] the constitutional violation by a policy, custom or practice," that

13  is, "a persistent, widespread course of conduct by municipal officials or

14  employees that has become the usual and accepted way of carrying out policy,

15  and has acquired the force of law, even though the municipality has not

16  necessarily formally adopted or announced the custom."   Joint App'x 2672.

17  Nevertheless, the City argues that there was insufficient evidence to support the

18  jury's findings that the City's evidence management system was fundamentally

19  inadequate, and that the City officials' failures and misconduct relating to that

20  system reflected a practice or custom.

21         A careful review of the record demonstrates otherwise.   The PCD Property

22  Guide describes the NYPD's official evidence management system and also

26

1    contains the PCD's policies and procedures for storing and tracking evidence.

2    According to the Property Guide, a key tool for tracking a particular piece of

3    property was a "yellow invoice" created when the property arrived at a PCD

4    borough office.   The yellow invoice was stored in an "active yellows" file.

5    Whenever the property moved, its new location was to be printed on the yellow

6    invoice.   When the property was transported to court, the yellow invoice was to

7    be stored temporarily in an "out-to-court yellows" file, with an "out of custody"

8    card placed in its stead in the active yellows file.   When the property was

9    destroyed or auctioned, that fact and the date of destruction or sale were noted on

10   the yellow invoice and the invoice itself placed in a "closed-out yellows" box.   If

11   property was missing from its storage location, the supervisor of the PCD facility

12   was required to start a preliminary search that included (1) asking the arresting

13   officer whether the property was ever removed to court and subsequently

14   repackaged after return, and then (2) checking with Pearson Place Warehouse, a

15   warehouse facility in Queens, to determine if the missing property was located

16   there.

17        The NYPD's evidence management system failed miserably in Newton's

18   case.   When Newton moved for DNA testing under Section 440.30(1-a), the

19   District Attorney's Office filed an opposition containing a statement by an NYPD

20   Sergeant that mistakenly reported that the evidence and yellow invoice had likely

21   been destroyed.   In fact, the yellow invoice for the rape kit had been in the PCD

22   "out-to-court yellows" folder since May 1988, when the evidence was first

27

1    removed to be examined.   The invoice had never been returned to the active

2    yellows file, even though the rape kit had been returned to storage at Pearson

3    Place Warehouse.   Sergeant Thomas O'Connor was involved with documenting

4    property stored in another PCD warehouse in the Bronx and ultimately assigned

5    to locate the yellow invoice for the rape kit while Newton's federal suit was

6    pending.   In one search, he found hundreds of property items and evidence with

7    no paperwork attached to them in the warehouse, as well as "[a]bout a hundred

8    or so" loose invoices that had not been marked either "destroyed" or "auctioned."

9    Joint App'x 2407-08.   Included among the loose invoices were invoices for

10   Newton's blue suede sneakers and for clothing from the victim, V.J., related to

11   Newton's case.   See Joint App'x 2408; see also Joint App'x 2767, 2773.

12        Of course, as Sergeant O'Connor's experience suggested, the problem of

13   lost invoices and evidence was by no means isolated to Newton's case: Sergeant

14   O'Connor was aware of other evidence that had been lost, Joint App'x 2401, and

15   the NYPD's failure to track evidence appears to have been pervasive.   Around

16   the time of Newton's trial, the Bronx property clerk's office had hundreds of

17   "out-to-court yellows" folders, dating back to the 1970s, that contained thousands

18   of yellow invoices; the property reflected on those invoices had never been

19   returned to the PCD or, like the rape kit in Newton's case, had been returned but

20   not properly recorded.   Joint App'x 2403.   Inspector Jack Trabitz, the PCD's

21   commanding officer at the time of the 2010 jury trial, testified that between

22   approximately 1800 and 3200 invoices went out to court from the Bronx borough

28

1    office each year from 1994 to 2006.   Joint App'x 2220.   Sergeant Bruce Kessler,

2    the commanding officer of the Bronx PCD borough office from approximately

3    1992 to 2003, could not even recall the procedure for evidence retrieval in the

4    event an item of evidence had not been returned to the borough office after a year.

5    Joint App'x 2359-60.[11]

6        The failures of the NYPD's evidence management and retrieval system

7    directly affected the offices of the District Attorneys, as well as certain

8    non-governmental entities.   From 2005 to 2009, requests from the District

9    Attorney's offices for post-conviction evidence frequently went unanswered

10   because logbooks contained inaccurate information and in "[n]umerous" cases

---

[11] Although Newton refrains from advancing a failure-to-train claim on appeal,
we cannot help but note that, based on the evidence, the inadequacy of the City's
evidence management system appears to have been rooted in some part in the
City's inadequate training of NYPD officers regarding evidence management.
According to the evidence at trial, several PCD officers, including high-ranking
officials, were unfamiliar with the Property Guide and lacked training in evidence
management.   And before 1995, when the Property Guide was created, there was
no written procedure for evidence management.   Joint App'x 2357.   As a result,
both a former commanding officer who supervised the PCD starting in 1990 and
one of his successors who started in 2000 received no formal training whatsoever
regarding the operations of the PCD.   Joint App'x 2516-17, 2519, 2164.
Similarly, throughout the 1990s, lower-ranking officers who worked at the PCD –
including the Pearson Place Warehouse – failed to receive relevant training or a
written manual on property and evidence management.   Joint App'x 2461, 2464.
More disturbing still, Integrity Control Officers responsible for ensuring that
employees at the PCD complied with the procedures in the Property Guide
appeared to be unfamiliar with those procedures or the evidence management
component of their positions.   Joint App'x 2166, 2345-47, 2364, 2598.

29

1   yellow invoices were missing.   Only about twenty percent of prosecutorial

2   requests for pre-1988 post-conviction evidence were satisfied.   Joint App'x 2401.

3   Other, equally disquieting examples of missing invoices involved the Innocence

4   Project, an organization devoted to exonerating innocent convicted defendants.

5   See Joint App'x 2601.   At the request of the Innocence Project in 2006, the PCD

6   identified and located eighty-seven invoices relevant to Innocence Project cases.

7   Nevertheless, the City acknowledged that the remaining eighty-three relevant

8   invoices "were not in the custody of the [PCD], ha[d] already been destroyed or

9   were released according to Department procedures."   Joint App'x 3444; see also

10  Joint App'x 2556, 2610.   Fifty percent of the cases that the Innocence Project

11  terminated in the City over a ten-year period were closed because the PCD had

12  lost or destroyed DNA evidence.[12]   Joint App'x 2603.

13          Newton also adduced evidence that, prior to his release, the PCD had no

14  reliable system to determine what evidence had been destroyed and that, as a

15  result, evidence may have been improperly destroyed, or, as in Newton's case,

16  reported destroyed when it had not been.   Prior to 2000, for example, the PCD

17  routinely disposed of rape kits,[13]  Joint App'x 2171-73, as well as so-called "white"

_____

[12] According to the testimony of an Innocence Project attorney, the national percentage of Innocence Project cases closed due to lost or destroyed DNA evidence was significantly lower than the percentage of such cases in the City. Joint App'x 2603.

[13] In 2006 the commanding officer of the PCD finally issued a written memorandum instructing that sexual assault evidence kits should never be destroyed.   Joint App'x 2172-73.

30

1    invoices, which described whether a piece of evidence had been destroyed or

2    retained by the NYPD, Joint App'x 2469.   Destroying the white invoice for

3    evidence prevented the PCD from tracking that evidence.   In 1992 and 1998,

4    moreover, the PCD engaged in what may aptly be characterized as sweeps, in

5    which it disposed of a substantial amount of arrest evidence that had not been

6    claimed.   Joint App'x 2470.   Although the evidence management system

7    improved after 2000, the PCD's commanding officer starting that year was

8    unaware that the Property Guide prohibited the destruction of arrest evidence

9    without a district attorney release, and he admitted that arrest evidence may have

10   been improperly destroyed under his command.   Joint App'x 2171.

11         Newton's expert witness, an "evidence specialist" who consulted with

12   police departments throughout the United States regarding evidence

13   management, also described the inadequacy of the NYPD's evidence

14   management system.   The expert concluded that the City's evidence

15   management system, as it existed from 1994 to 2005, was "sporadic at best."

16   Joint App'x 2497.   Aspects of the system, including chain-of-custody procedures

17   and practices, were "weak, if not nonexistent" and failed to meet the most widely

18   accepted professional or "industry standards" in the field of evidence

19   management.[14]   Joint App'x 2490; see also Joint App'x 2491.

---

[14] According to Newton's expert witness, the two most widely accepted industry
standards in the field of evidence management are promulgated by the
International Association of Property and Evidence, an organization that

31

1          In sum, Newton presented evidence that thousands of sometimes

2    decades-old yellow invoices at the Bronx property clerk's office – out of a total of

3    not more than 3200 such invoices per year – were in old out-to-court folders that

4    had improperly never been closed out; evidence listed as "out-to-court" for over

5    twenty years was lost; the PCD had lost track of and was unable to retrieve

6    evidence in an unreasonably large number of cases (involving evidence older

7    than five years); several high-level officials tasked with supervising the NYPD's

8    evidence management system were unfamiliar with the PCD's procedures; and

9    the PCD's dysfunction had an unconstitutionally deleterious effect on case

10    closings in a large number of cases, including, obviously, Newton's.   The

11    problem in Newton's case was with the retrieval of evidence that was sitting there

12    all along.   Despite the preservation of the evidence that proved crucial in

13    exonerating Newton, the PCD was unable to locate it from 1994 to 2005 and

14    inaccurately represented that it had been destroyed either in a fire or pursuant to

15    a regular disposal procedure that may not even have existed.   Had Newton

16    accepted the City's recklessly erroneous representations about the evidence at

17    face value, he might have remained in prison far longer than he did.   Taken

18    together, this evidence supports a finding that the City, through the poor

---

provides educational resources and training on evidence management practices,
and the Commission on Accreditation for Law Enforcement Agencies, a
credentialing authority that determines whether law enforcement agencies have
met industry-wide public safety standards.   Joint App'x 2484-85.

1   administration of its evidence management system, perpetuated a practice or

2   custom that was wholly inadequate.

3           We acknowledge the City's argument that a § 1983 plaintiff seeking to hold

4   a municipality liable must "show that the municipal action was taken with the

5   requisite degree of culpability and must demonstrate a direct causal link between

6   the municipal action and the deprivation of federal rights."   Brown, 520 U.S. at

7   404.   There must be "proof that the municipality's decision was

8   unconstitutional" to "establish that the municipality itself [i]s liable for the

9   plaintiff's constitutional injury."   Brown, 520 U.S. at 406 (emphasis added).   The

10  Supreme Court has declined to consider "whether something less than intentional

11  conduct, such as recklessness or gross negligence, is enough to trigger the

12  protections of the Due Process Clause."[15]   Daniels v. Williams, 474 U.S. 327, 334

13  n.3 (1986) (quotation marks omitted).   But in Brown it held that "a plaintiff

14  seeking to establish municipal liability on the theory that a facially lawful

15  municipal action has led an employee to violate a plaintiff's rights must

16  demonstrate that the municipal action was taken with deliberate indifference as

17  to its known or obvious consequences."   Brown, 520 U.S. at 407 (quotation marks

18  omitted).   Although we have not explicitly addressed this question in our

---

[15] The Supreme Court has held that in a § 1983 claim against a municipality for failure to train its police force, a plaintiff is required only to show that the municipality was deliberately indifferent to the rights of those with whom the police would come into contact; however, the Court distinguished that standard from the state of mind required for an underlying claim of a constitutional violation.   City of Canton, Ohio v. Harris, 489 U.S. 378, 388 & n.8 (1989).

33

1   subsequent cases, see Barbera v. Smith, 836 F.2d 96, 99 (2d Cir. 1987), we have

2   maintained that "a state prison guard's deliberate indifference to the

3   consequences of his conduct for those under his control and dependent upon him

4   may support a claim under § 1983."[16]   Morales v. N.Y. State Dep't of Corr., 842

5   F.2d 27, 30 (2d Cir. 1988).

6       In keeping with Brown and Morales, we conclude that under the

7   circumstances presented here Newton at most needed to demonstrate that the

8   City acted with recklessness or deliberate indifference[17] toward his constitutional

9   rights.[18]   Here, of course, the jury actually found that the City had "acted with an

───────────────────

[16] Other courts of appeals have suggested that recklessness or deliberate
indifference may suffice to establish grounds for a constitutional violation.   See,
e.g., Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991); Torres Ramirez v.
Bermudez Garcia, 898 F.2d 224, 227 (1st Cir. 1990); Wood v. Ostrander, 879 F.2d
583, 587-88 (9th Cir. 1989); Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859
F.2d 929, 948-50 (D.C. Cir. 1988).

[17] "[T]he Courts of Appeals have routinely equated deliberate indifference with
recklessness."   Farmer v. Brennan, 511 U.S. 825, 836 (1994).

[18] It is not altogether clear that Newton was required to make even this showing
(although, as we explain infra, he has plainly done so).   A plaintiff can identify a
municipal policy by proving the existence of an unlawful practice or custom that
is "so manifest as to imply the constructive acquiescence of senior policy-making
officials."   Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992)).
After considering Newton's Fourteenth Amendment claim, the jury also found
that the City "directly cause[d] the constitutional violation by a policy, custom or
practice," because the mismanagement of evidence was "persistent" and
"widespread," "ha[d] become the usual and accepted way of carrying out policy,
and ha[d] acquired the force of law."   Joint App'x 2672.   Because Newton

34

1  intent to deprive . . . Newton of his constitutional rights or with a reckless

2  disregard of those rights."   Joint App'x 3502.   This finding, to which we afford

3  "considerable deference," is supported by the record.   See Zeno v. Pine Plains

4  Cent. Sch. Dist., 702 F.3d 655, 671 (2d Cir. 2012).   And so a recklessness or

5  deliberate indifference analysis should have compelled the District Court to

6  uphold the 2010 jury verdict.

7                    4.   Arizona v. Youngblood

8           Our conclusion is consistent with Arizona v. Youngblood, 488 U.S. 51

9  (1988).   In Youngblood, the Supreme Court held that "unless a criminal

10  defendant can show bad faith on the part of the police, failure to preserve

11  potentially useful evidence does not constitute a denial of due process of law."

12  Id. at 58.   "The presence or absence of bad faith by the police for purposes of the

13  Due Process Clause must necessarily turn on the police's knowledge of the

14  exculpatory value of the evidence at the time it was lost or destroyed," id. at 56

15  n.*, and is relevant "when we deal with the failure of the State to preserve

16  evidentiary material of which no more can be said than that it could have been

---

proved that the City engaged directly in an unlawful custom or practice, he may
not have also needed to prove that City officials acted with recklessness or
deliberate indifference.   See Brown, 520 U.S. at 404 ("Where a plaintiff claims
that a particular municipal action itself violates federal law, . . . resolving [the]
issues of fault and causation is straightforward.").   We do not need to decide that
issue here, however, because the trial evidence supports the jury's finding of
reckless disregard.

35

1  subjected to tests, the results of which might have exonerated the defendant," <u>id.</u>

2  at 57.

3       In light of <u>Youngblood</u>, we must again recognize that a fundamentally

4  adequate system for permitting defendants to access evidence may be, and will

5  be, imperfect – one where evidence is sometimes lost or inadvertently destroyed.

6  Largely because this is not a "failure to preserve" case, however (the DNA

7  evidence that Newton sought was preserved, after all), our holding falls outside

8  the scope of <u>Youngblood</u> and reflects the limited prescription of Section

9  440.30(1-a)(b), which demands only that the NYPD's evidence management

10  system provide an adequate means to determine if evidence is available for

11  testing and, if so, where the evidence is located.    Although <u>Youngblood</u> makes

12  clear that Newton was not entitled to the preservation of evidence, he <u>was</u>

13  entitled to a faithful accounting of the evidence in the City's possession.

14  Otherwise, it seems to us, the statutory scheme developed by the State would

15  have little if any purpose.

16       Our view that <u>Youngblood</u> does not control the disposition of this appeal is

17  fortified when we consider the two concerns that appear to have animated

18  <u>Youngblood</u>'s requirement that the plaintiff show bad faith on the part of the

19  police under these circumstances.    First, the requirement relieves courts from

20  undertaking "the treacherous task of divining the import of materials whose

21  contents are unknown and, very often, disputed."    <u>Id.</u> at 58 (quotation marks

22  omitted).    Second, the Court was "unwilling[] to read the 'fundamental fairness'

1   requirement of the Due Process Clause as imposing on the police an

2   undifferentiated and absolute duty to retain and to preserve all material that

3   might be of conceivable evidentiary significance in a particular prosecution."   Id.

4   (citation omitted).   "[R]equiring a defendant to show bad faith on the part of the

5   police both limits the extent of the police's obligation to preserve evidence to

6   reasonable bounds and confines it to that class of cases where the interests of

7   justice most clearly require it, i.e., those cases in which the police themselves by

8   their conduct indicate that the evidence could form a basis for exonerating the

9   defendant."   Id.

10          Neither concern exists in this case.[19]   As an initial matter, Newton may

11   recover under § 1983 for inadequate evidence management because the DNA

12   evidence had already exonerated him.   The District Court did not need to

13   "divine" the exculpatory import of the DNA evidence; its import was clear by the

14   time Newton started this action with the benefit of that evidence.   In addition,

15   we neither discern nor impose an "absolute" duty on the police to preserve

16   evidence based on a freestanding constitutional due process right.   To the

17   contrary, Section 440.10(1)(g) applies to newly discovered evidence, including

18   new DNA test results, and says next to nothing about a duty to maintain

19   evidence.

---

[19]  The jury did not find that the City acted in bad faith, as defined in Youngblood, and the record does not support such a finding.

1     In short, had the City destroyed his DNA evidence according to a

2  legitimate procedure that conformed with State law, Newton would have no

3  claim under § 1983.   Without deciding a question not before us, we do not see

4  how an incarcerated defendant (or even a person like Newton) without

5  exonerating evidence obtained by invoking State procedures would have a due

6  process claim for relief under § 1983 based on our holding today.   In contrast to

7  <u>Youngblood</u>, the issue here is whether a municipality may be held liable for its

8  reckless maintenance of a system that made it impossible to retrieve evidence that

9  <u>had been</u> preserved, that State law recognized as particularly significant, and that

10  ultimately exonerated the defendant.

11          5.     <u>Jury Instructions Regarding Newton's Due Process Claim</u>

12     Lastly, the City also challenges the jury instructions relating to Newton's

13  due process claim.   The District Court instructed the jury that it could find that

14  the City had violated Newton's Fourteenth Amendment rights only if, among

15  other requirements, "the City engaged in a pattern, custom or practice of

16  mishandling evidence by operating a poor or a nonexistent evidence management

17  system," and this "violated [Newton's] constitutional rights by . . . denying

18  [Newton] his Fourteenth Amendment right to due process by employing an

19  inadequate evidence management system that caused City employees to

20  prematurely abandon their search for his evidence in 1994 under the mistaken

21  assumption that it had been destroyed."   Joint App'x 2673.

38

1    The challenged jury instructions were not wrong.   They correctly required

2    the jury to find that the City's evidence management system was "inadequate" as

3    a matter of due process if it prevented Newton from availing himself of the

4    procedures in Section 440.30(1-a)(a).   The jury instructions also correctly

5    premised the City's liability on the failure of its evidence management system to

6    <u>account</u> for the evidence, not on the destruction of evidence.   <u>Cf.</u> Joint App'x

7    2673.

8         B.    <u>First Amendment Court-Access Claim</u>

9         Newton also claims that the City is liable under § 1983 for violating his First

10   Amendment right of access to the courts based on its failure to provide him with

11   evidence to challenge his conviction.   We need not address this issue at length.

12   Because the jury awarded damages on the § 1983 claim in order to

13   "compensate . . . Newton for any pain and suffering caused by the city's failure to

14   produce the rape kit for test[ing]," Joint App'x 2720, the damages award would be

15   reinstated in full even if we were to affirm the District Court with regard to either

16   Newton's Fourteenth Amendment due process claim or his First Amendment

17   access-to-the-courts claim, as long as we did not affirm with regard to both.   <u>Cf.</u>

18   <u>This is Me, Inc. v. Taylor</u>, 157 F.3d 139, 146 (2d Cir. 1998) ("As long as there is

19   some evidence based upon which the jury could have held [the defendants]

20   individually liable, we must reinstate the verdict.").

21        In any event, the District Court's decision to grant the City's motion to set

22   aside the jury's verdict on this claim appears to have rested almost entirely on its

1    rejection of Newton's underlying Fourteenth Amendment claim that the City

2    violated his procedural right to due process.   On appeal, the City parrots the

3    District Court's rationale, arguing that Newton's access-to-courts claim fails

4    because he had no viable constitutional claim to DNA evidence in the first place.

5    Having rejected the premise of the District Court's decision and the City's

6    principal argument, we vacate the District Court's judgment dismissing Newton's

7    First Amendment claim and remand to the District Court to reconsider the claim,

8    if necessary, in light of this opinion.[20]

9                                    **CONCLUSION**

10      We are confident that the evidence management failures identified in this

11   case have been or will soon be remedied with the help of modern technological

12   advances and stronger recordkeeping practices.   For the foregoing reasons,

13   however, we VACATE the judgment of the District Court and REMAND the case

14   with instructions to reinstate the jury verdict with respect to Newton's Fourteenth

15   Amendment claim and to reconsider Newton's First Amendment claim in light of

16   this opinion.

---

[20] The City also argues that Newton's access-to-courts claim was inadequately
pleaded and procedurally barred and that Newton forfeited his First Amendment
claim because he first mentioned denial of access in his trial brief and in his
opposition to the defendants' August 2010 motion to dismiss.   After reviewing
the record, we conclude that both arguments are without merit.